IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA PLAINTIFF

VERSUS CIVIL ACTION NO. 3:13-CV-00978-HTW-LRA

CITY OF MERIDIAN, ET AL. DEFENDANTS

TELEPHONIC STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE HENRY T. WINGATE,
UNITED STATES DISTRICT COURT JUDGE,
SEPTEMBER 1, 2020,
JACKSON, MISSISSIPPI

(APPEARANCES NOTED HEREIN.)

REPORTED BY:

CANDICE S. CRANE, RPR, CCR #1781
OFFICIAL COURT REPORTER
501 E. Court Street, Suite 2.500
Jackson, Mississippi 39201
Telephone: (601)608-4187
E-mail: Candice_Crane@mssd.uscourts.gov

**TELEPHONIC APPEARANCES:**

FOR THE PLAINTIFF: FORESTINE NICOLE PORTER, ESQ.
RICHARD CHARLES GOEMANN, ESQ.
MITZI DEASE PAIGE, ESQ.

FOR THE DEFENDANTS: RONNIE L. WALTON, ESQ.
LEE THAGGARD, ESQ.
DOUGLAS T. MIRACLE, ESQ.
KERMIT KENDRICK, ESQ.

**VIA TELEPHONE, SEPTEMBER 1, 2020**

MS. CASTILLA: Good morning, everyone. This is Carmen Castilla in Judge Wingate's office, and I know we have quite a few people on the line.

Judge, are you there?

THE COURT: I am here.

MS. CASTILLA: Okay. All right. Do you want me to call the roll, or do you want to find out who everybody is?

THE COURT: Why don't you call the roll.

MS. CASTILLA: And, Candice, are you on the line yet?

THE COURT REPORTER: I am.

MS. CASTILLA: Okay. All right.

THE COURT: Hello, Candice. How are you today?

THE COURT REPORTER: I'm good. How are you, Judge?

THE COURT: I'm doing fine.

THE COURT REPORTER: Good to hear it.

MS. CASTILLA: Okay. We do have a court reporter on the line with us, everyone.

Okay. From the -- from the US, from the United States of America, Department of Justice, do we have Nicole Porter?

MS. PORTER: Yes, I'm here.

MS. CASTILLA: Okay. Do we have Mitzi Paige?

MS. PAIGE: I'm here.

MS. CASTILLA: Good afternoon, rather.

MS. PAIGE: Good afternoon.

MS. CASTILLA: Okay. Someone else, I think, just joined us.

MR. THAGGARD: Yes, Lee Thaggard.

MS. CASTILLA: Oh, okay. All right. Well, so far we have Nicole Porter and Mitzi Paige.

Anyone else from the Department of Justice or representing the United States?

MR. GOEMANN: Yes. Good afternoon. This is Richard Goemann also on behalf of the United States. And we are also joined by Dana Shoenberg, an expert consultant who was formerly the monitor in this case, but who now is a consultant for the United States.

MS. CASTILLA: And good afternoon, Mr. Goemann and Ms. Shoenberg.

MS. SHOENBERG: Good afternoon.

MR. GOEMANN: Good afternoon.

MS. CASTILLA: Anyone else from the United States?

Okay. From the City of Meridian, we should have Mr. Walton. Are you there, Mr. Walton?

MR. WALTON: I am.

MS. CASTILLA: Okay. Do you go by Ronnie Walton?

MR. WALTON: I do.

MS. CASTILLA: Okay. And I believe you said that Mr. Kermit Kendrick from the City Attorney's Office was going

to be joining us. Are you there, Mr. Kendrick? Not yet?

MR. WALTON: Apparently not yet.

MS. CASTILLA: Okay. All right.

MR. KENDRICK: Hey, this is Kermit Kendrick, City Attorney.

MS. CASTILLA: All right. Just perfect timing, Mr. Kendrick. We were just going through everyone we had on the line, and I had just gotten to your name. I realize it wasn't quite 1:30, but we had so many people on the line that we went ahead and got started.

This is Carmen Castilla with Judge Wingate's office. Judge Wingate is also on the line. And so far, we've got Nicole Porter, Mitzi Paige, Richard Goemann, Dana Shoenberg, Ronnie Walton, and yourself.

Is there anyone else from the City?

MR. KENDRICK: Well, yes, I have one of my -- one of my partners. Her name is Skyler Espy (phonetically). She is new to this matter. She is one of our EPA experts, and she's listening in.

MS. CASTILLA: Okay. All right. And good afternoon, Mr. Kendrick and Ms. Espy.

Okay. I know from the County of Lauderdale, we have Mr. Thaggard, Lee Thaggard?

MR. THAGGARD: Yes, ma'am.

MS. CASTILLA: Anyone else from the County?

MR. THAGGARD: Just me, and I'll be appearing for the judges as well.

MS. CASTILLA: Okay. And from the State of Mississippi, Mr. Miracle, are you there? Do we know if anyone from -- has anyone spoken with anyone from the State?

Judge, that's everyone except someone with the State Attorney General's office, but I don't know if you had to have them present. Of course, it's just barely 1:30, so we might wait a minute or two.

THE COURT: All right. Why don't you wait a minute or two, then recall the roll at 1:31. Okay?

MS. CASTILLA: Okay. Okay. I have not heard anyone else join the line, and it is 1:31. Actually, I have three different times. Between my watch, my computer, and my phone, I have three different times, but it is at least 1:31 at this point, Judge.

THE COURT: All right. We can start then.

I heard all the names that were mentioned earlier. And since there are no additional people, then we don't have to add anybody else to the list, so we're ready to get started.

Good afternoon, everyone. This is Judge Wingate.

MS. PORTER: Good afternoon, Your Honor.

MR. KENDRICK: Good afternoon, Your Honor.

THE COURT: Now, then, I wanted to schedule this conference in order to determine exactly where we are. I've

read the compromise papers, the agreement. I've read all of that, as I have all during the course of this litigation, and kept up with all of the matters that we have been handling --

Oh, I heard someone new.

MS. CASTILLA: Yes.

MR. MIRACLE: This is Doug Miracle. I apologize. I was getting a busy signal when I was trying to log in, so I do apologize, Your Honor.

THE COURT: That's okay. We had just asked about you, Mr. Miracle.

MR. MIRACLE: Well, I apologize. I was starting to panic when I was getting a busy signal, so I may have been dialing the wrong thing. But please accept my apology.

THE COURT: It is accepted.

MR. MIRACLE: Thank you.

THE COURT: So now we are ready to get started. All I had said was that I had wanted this conference so that I can get all of the details concerning how you-all reached an agreement and the satisfaction with regard to that agreement, and further, what has happened after the agreement, if anything.

Now, who would like to give the backdrop of how you-all reached this point? Not everybody at one time now.

MS. PORTER: Your Honor, this is Nicole Porter from the United States. Are you talking about the agreement between

the United States and the City or the agreement between the United States and the State of Mississippi?

THE COURT: Let's talk about the City.

MS. PORTER: Okay. Well, as you know, Your Honor, we have a joint motion to terminate in front of you. The City, over the past number of years, has complied with all the terms of the settlement agreement. They have reached substantial compliance. They have completed policies and training prohibiting school-based arrests. They have not engaged in any school-based arrests. They are not going up to the schools inappropriately.

They have entered into an MOU with the school district police delineating responsibility for responding to school calls. And they've also conducted the training that was required under the settlement agreement, the bias-free policing training, the juvenile child adolescence training, and they've also revised their internal affairs policies and procedures.

So on the basis of the work that they have done in terms of (AUDIO GAP) the provisions of the settlement agreement, we have filed a joint motion that is in front of you that the agreement be terminated.

Pursuant to the settlement agreement, the agreement would be terminated once the parties have reached -- or once the City has reached substantial compliance and maintained

that substantial compliance for one year, and the City has done so.

THE COURT: All right. I want you to slow down some. We have a court reporter who is taking down everything.

MS. PORTER: I'm sorry, Your Honor.

THE COURT: So slow down just a bit. And by the way, I've read all the papers you have submitted thus far. Now -- but go ahead and finish what you were saying, and then I'll have some questions for you. Okay?

MS. PORTER: Sure. I was just wrapping up and saying that the City has substantially complied with all the provisions of the settlement agreement, and they've maintained that substantial compliance for a period of one year. And so we think that it is an appropriate time to terminate the settlement agreement.

THE COURT: All right. Now, again, for -- again, to everyone, we have Candice on the line. She is the court reporter.

Candice, say hello to everybody.

THE COURT REPORTER: Hello.

THE COURT: Okay. Now, that's her break. Now, that's Candice, and so she is the court reporter.

Now, back to where we are. I have the papers in front of me. And I have pored over the papers, so I understand exactly what is being said. But I have some questions about

some of the particulars. I'll start off with this matter of training. Who is conducting the training that's called for in the papers?

MS. PORTER: Your Honor, Lee Marlow conducted the adolescent training for the department, and that was done in July of 2017. With respect to the bias-free policing training --

THE COURT: Stop. Now stop there. Now, first of all, anyone who is speaking, please identify yourself for my court reporter.

MS. PORTER: I apologize, Your Honor. This is Nicole Porter from the United States.

THE COURT: All right. Now, let's go back to this training. This last training was when?

MS. PORTER: This training, the adolescent child development training that Dr. Marlow conducted, was done in July of 2017.

THE COURT: Now, you had asked for -- well, why don't you go ahead and tell me then. I was about to go ahead and tell you what I know about it, but why don't you go ahead and tell me about this training, specifically, what kind of training was conducted, to whom, and over what period of time.

MS. PORTER: Thank you, Your Honor. This training was conducted in July 2017, and it was really training that dealt with how adolescent brains develop. And so we wanted to give

police officers a better understanding of how juveniles think and interpret the world around them. And that way, the police officer would be armed with that knowledge when they interacted with juveniles, and they can understand their perspectives better.

In addition to that --

THE COURT: Put some more meat on that skeleton for me, please. What do you mean by how their brains approach things? Give me a summary of what you're saying about that training and that approach.

MS. PORTER: I think, in terms of a summary, it's just the officers needed to have more information, more guidance on the decisionmaking process for young people. And to understand that although someone may look like they're 18, 19, 20, they're still functioning at their actual age, which may be 13 or 14, and that they don't make decisions the same way that an adult would make a decision.

And so we thought that particular training would be very helpful to the officers, because they can have a better understanding of a juvenile's thought process, how they interpret information, how they make decisions. And when the officers are armed with that knowledge, they can police younger people more equitably and fairly.

THE COURT: Who conducted the training?

MS. PORTER: It was Dr. Lee Marlow. And I don't have

her resume in front of me. I don't know if Mr. Walton has anymore information about her particular background.

I do recall that she was an employee at the Weems Center. And the training that she provided was very well received by the officers there, as was the training that was put on by the instructors who conducted the bias-free police training.

THE COURT: And who were the attendees at this training session?

MS. PORTER: It was all of the Meridian police officers and the command staff.

THE COURT: And how many officers were we talking about?

MS. PORTER: I think that we were probably talking about 60 officers that attended this training. It was a very well received training. DOJ attended it and also one of the attorneys who was representing the City, Lee Darcy, attended the training at the time.

THE COURT: And how long did it last?

MS. PORTER: That training, Your Honor, I believe that training lasted about four hours.

THE COURT: And so you didn't have all of the officers there at the same time; is that correct?

MS. PORTER: Your Honor, I -- it -- I apologize, Your Honor. It's been a little over two and a half years, but I do believe that most of the officers attended this particular

training. Unless they had some other commitment that they weren't able to get out of, I believe that the officers attended this particular training, most of the officers.

But, again, apologies, Your Honor. It has been some time since the training was held.

THE COURT: Did they receive any sort of certificates for having attended?

MS. PORTER: I'm not sure if they received a certificate, but I know that we were forwarded a log from the police department indicating the officers that attended the training.

THE COURT: And when the expert dealt with the mindset of these various young people, up to what age was this approach deemed to be relevant? 21 or 18 are magical numbers concerning maturity.

MS. PORTER: Yeah. It was really --

THE COURT: So --

MS. PORTER: Oh, I'm sorry Your Honor.

THE COURT: So I just want to finish the question.

So then these -- so this approach dealt with youth up to the age of 18 or up to the age of 21?

MS. PORTER: Your Honor, this approach really dealt with -- I believe it dealt with up to the age of 18. It was really dealing with adolescent training, and so that's what it focused on. But I think that the training also talked about

young adults as well. So it would have encompassed those individuals over the age of 18, up until the age of 21, and maybe even 22 and 23.

THE COURT: Did the presenter provide concrete examples of the different mindsets of juveniles in certain situations as opposed to the mindset of mature adults?

MS. PORTER: Yes, she did.

THE COURT: Can you think of one illustration?

MS. PORTER: Your Honor, it's been a while, and so I don't have a copy of the PowerPoint on hand where I could pull a specific illustration right now. But if you give me a few minutes, I can find the PowerPoint, and we can talk more specifically about the training and some of the specific examples that she provided.

I do recall, though, that it was a very good training. The officers received it well. And that we thought, at DOJ, that she did an excellent job with respect to the delivery.

And I also would like to say that, in the course of developing the training, she did submit slides to us. We reviewed those slides, and we had a number of meetings with Dr. Marlow to talk about the training and ways that she could improve various slides on the PowerPoint.

But if you'd like, if you can give me a few minutes, I could pull the actual PowerPoint, and we could talk about that in more detail.

THE COURT: Okay. Now, was this training videotaped?

MS. PORTER: No, the training was not videotaped.

THE COURT: Were the handouts placed in a booklet for future reference?

MS. PORTER: I am not sure about that. But I do know that the police department received a copy of the handout, so it could easily be made available to officers who missed the training or incoming officers.

THE COURT: Was there a test provided to the participants at the end of the session?

MS. PORTER: I'm sorry, Your Honor, I'm trying to recall if there was a test. I don't recall from my memory whether there was a test. That would be one of those things where I'd have to look back at the slides and let you know.

THE COURT: Okay. But in all, you're satisfied with the training presentation and with the reception that was accorded by the participants; is that --

MS. PORTER: Yes, that's correct, Your Honor.

THE COURT: Now, is this schedule a part of the agreement? I know that now that you are asking that your oversight cease at this point, unless there is some sort of violation, but does any of this call for future training?

MS. PORTER: It doesn't call for future training, but I do believe that the City is free to adopt additional training.

And I know that when we've had community meetings with

the City and the head of the police department, the police chief indicated that these types of trainings will continue, and that he saw the benefit in the trainings, that he thought the trainings were very helpful.

THE COURT: Now, training was one of the remedies that you thought that would be helpful towards remedying the situation of which you complained.

What was the most severe violation that you attributed to the defendants during the course of the litigation that required some sort of remedy?

MS. PORTER: I think, Your Honor, it was just the fact that they were conducting school-based arrests for incidents that really weren't, in our view, considered criminal activity. And so once we opened our investigation and notified them of our concerns, the City did put measures in place to make sure that those school-based arrests weren't continuing.

But we also had additional concerns just about the police department's presence at the schools, and so that's why we enacted a host of remedies to address that.

And I have to say, Your Honor, during the course of the settlement agreement implementation, the City was very good about complying with the provisions of the settlement agreement, being responsive to any sort of requests that we had with respect to documents, and then also just making sure

that the police department, its officers knew about the terms of the consent decree and complied with them.

THE COURT: What has transpired in the last one year since this training has occurred, since the parties have come together trying to resolve these differences?

You said that there has not been a real police presence there at the schools; is that correct?

MS. PORTER: That's correct, Your Honor. Not during the time that we were monitoring the settlement agreement, that's correct.

THE COURT: And have you monitored what type of violations took place during this time period at the school by the students?

MS. PORTER: Yes. Yes, Your Honor. In terms of our monitoring responsibilities, yes, we did look at the types of issues that were going on that required police presence.

Remember that there were no school-based arrests going on from the -- during the time that we were engaging in United States monitoring, but there were still some occasions where the police department went up to the schools. And in those cases, we determined that the police department's presence at the school was appropriate. And it was really to investigate criminal activity, which is something that we set forth in our agreement is really the only reason that the department should be going up to the schools to begin with, if they're

investigating criminal activity, and not to arrest kids for any offense that is essentially school related.

THE COURT: Were there any arrests during the time period?

MS. PORTER: There were some arrests that the police department participated in, but they were not school-based arrests. Like, for an example, in one situation there was a young person who was arrested by the school district police, and the school district needed the police department to assist them in transporting that particular person to jail. And so the police department did that.

But in terms of their involvement in arrests, they would basically assist (AUDIO GAP) and not actually engaging in any sort of arrests based on criminal activities themselves. They weren't the lead on those particular arrests.

THE COURT: How many arrests would you say occurred in this time period?

MS. PORTER: Okay. I can pull this information up for you, Judge, with respect to the number of arrests.

THE COURT: Okay.

MS. PORTER: And I'm doing so, Your Honor. I just ask that you bear with me. My computer is --

THE COURT: That's okay. Go right ahead. Take your time.

MS. PORTER: My apologies, Your Honor. I don't know

what's happening with my computer, but it is taking a while to pull up these documents. I apologize.

THE COURT: That's all right.

MS. PORTER: I don't know, Your Honor, if you have another question that you want to ask me in the meantime while I'm pulling up this information for you.

THE COURT: I just want to be sure that I understand the practical effect and exactly what the protocol is now.

I understand what was stated during the course of the oral arguments, and I also understand what the paperwork shows. But when the school now desires police intervention, then tell me from that point on what happens.

Hello?

MS. PORTER: I'm sorry, Your Honor. I apologize. I didn't hear your question. Do you mind repeating it again? Apologies.

THE COURT: Okay. When the schools now want police intervention, what is the protocol? What happens, step by step?

MS. PORTER: When the police -- when the school actually wants police intervention, they actually contact the district police department. They do not contact the police department, particularly when they're talking about dealing with a matter that can be considered a disciplinary matter. That's something that's handled by the police department.

If the school district police department -- whether it's a school-based matter or a matter involving criminal activity -- if they get information from the school, and they feel as though this is something where they need the police department's assistance, they will reach out to the police department.

And then, also, the police department will respond to any sort of 911 call or call from the dispatch that says that there's criminal activity going on at the school that the police department needs to be involved in. So the police department can be involved in a primary capacity or a secondary capacity with respect to --

THE COURT: Counsel, --

MS. PORTER: -- criminal activity. But other than that --

THE COURT: -- can you slow down?

MS. PORTER: I'm sorry, Your Honor.

THE COURT: Remember, we have a court reporter on the line, and she's on the telephone. Slow down just a little bit for me.

MS. PORTER: I'm sorry.

THE COURT: Okay. Go ahead. So then -- go ahead.

MS. PORTER: So I was just saying that the police department can act either in a primary capacity or a secondary capacity with respect to criminal activity. But other than

that, it's really a hands-off approach, and that's just pursuant to the MOU that the school district police and the Meridian Police Department have into play.

And so I don't know if the attorney for the City has anything to add with respect to the implementation of the settlement agreement or the practices that are going on right now, but I just wanted to give him an opportunity to weigh in, if he so chose.

THE COURT: Well, let me stay with you for the time being.

MS. PORTER: Sounds good.

THE COURT: If the police are of the opinion that a serious crime is afoot there at the school, what must the police do at that point?

MS. PORTER: Well, Your Honor, they would get a call. They're not supposed to go up to the school unannounced or uninvited. The way that they would go to the school would primarily be that they would receive a call, presumably a call from dispatch saying that there's criminal activity going on, or maybe the district police department could possibly reach out to them, too, if they needed assistance with a criminal matter.

But the whole point of the settlement agreement was to make it clear to the police department that they shouldn't be engaged in any sort of school-related matter; that they would

only go up to the schools, only become involved if there was criminal -- a suspicion of criminal activity occurring.

THE COURT: If a student calls in to the police and says, I just saw in the locker next to me a Glock, then what do you do? What is the police expected to do at that point?

MS. PORTER: I think that that's criminal activity, Your Honor. And so in that situation, the police would respond, because they are able to respond to complaints or concerns about criminal activity occurring at the school.

And so I don't think that the United States -- I know that the United States doesn't have a concern about the police department being engaged and responding to concerns about criminal activity. I think our concern was that the police department was going up to the school and initiating arrests based on things that weren't considered criminal activity.

If the school calls them about a disciplinary issue, for example, then they respond to that particular call, and those are the types of calls and the types of infractions that we thought were inappropriate for the police department to respond to.

THE COURT: Would the police department be required to follow any check-in procedure with the principal, administrators, upon going to the school on a call such as I just mentioned where someone has called in on a weapon?

MS. PORTER: I don't know about the specific procedures

that the police department would have in terms of responding, like specifically who they would check in with. That would probably be something that would be best answered by the City Attorney, if he knows, or the police chief.

But I will say that when we reviewed the documentation that we received from the City in monitoring the settlement agreement, we did believe that the police department officers were only going up to the school in matters that were appropriate.

THE COURT: If some student has been indicted by a grand jury but nevertheless is on school property, is there a specific protocol to effectuate the arrest of that student?

MS. PORTER: If the student is indicted by a grand jury and he is on the property, whether there's a specific protocol to address that?

THE COURT: That's correct. Is there no specific protocol to address the arrest of that student during the course of this school day?

MS. PORTER: Well, the MOU that's entered into between the school district police and the police department really talks about the responsibilities that each of them have and the authority that they have to make arrests on property -- on school district property. And so I think that in that situation, the police department would refer to the MOU and make a determination as to how that particular situation would

be handled.

THE COURT: So does the MOU say something specifically about that? Does it tell the police to forbear and not enter the school until after school is over to make an arrest?

MS. PORTER: I would have to look again at the MOU, Your Honor, to specifically answer that question for you.

THE COURT: Now, how did the police feel about this agreement as to protocols?

MS. PORTER: They responded very positively to the agreement. And they were very willing -- the entire police department was very willing to work with us to implement the terms of the agreement.

And we had a great relationship with Chief Dubose, the Chief of the Meridian Police Department during the time that we monitored the settlement agreement and also during the time that we had our independent police auditor monitor the settlement agreement as well.

THE COURT: Okay. Thank you.

Is there anyone on the phone who can speak from the perspective of the police?

MR. WALTON: Your Honor, this is Ronnie Walton. I was representing the City of Meridian back at the time that all of this was going on through the time that the joint motion to terminate was -- was filed back in May of last year. I am no longer serving as the attorney for the City of Meridian. But

to the extent that I have been asked to have ongoing monitoring of this until the case is finally dismissed, I have -- I'm the person to whom any relevant correspondence related to this is sent.

And to my knowledge, there have not been any issues whatsoever related to any school-based arrests that are not contemplated by the carve-outs in our consent decree for the specific reasons that the police are allowed to go onto campus.

And I'm not aware -- at least it's not been reported to me -- that there have been any instances, either school discipline related or the things that are carved out as the reasons that the police should go onto the campus have occurred.

I mean, to put this in historical context, Your Honor, we're talking about a situation, as far as the Department of Justice having raised a concern about it, that goes back to August of 2012. And either shortly before or shortly after the City first received notice from the Department of Justice, the City of Meridian Police Department had ceased making school-based arrests, primarily because the person who was the superintendent of the schools at that time had decided that the appropriate way for the school district to respond to these was by creating their own internal police department.

So, you know, arrests based on school discipline

issue -- if arrest is the appropriate term -- were -- have not been made by the City of Meridian Police Department for the last eight years.

And, of course, the consent decree called for an independent monitor to make sure that the City was doing what it was required to do under the terms of the consent decree, and reports were filed with the court on a -- I believe, a quarterly basis. And based on my review of those reports, in all of the categories that the City was obligated to take remedial action, the City made steady progress to the point where the independent monitor finally reported to the Court that it was appropriate for him to step out, and for the Department of Justice to take over the monitoring of compliance with the consent decree themselves.

And I want to commend Nicole Porter. She and I have had the opportunity to work closely with this, but she has been much more hands-on involved with the nuts and bolts of the compliance than have I. And, I mean, all I can do is echo that the City agrees with everything that she has said in the way of reporting what the details have been.

But I don't have before me this afternoon the Memorandum of Understanding between the City of Meridian Police Department and the school district, and that was a document that the City had to negotiate with an entity that was not a party to this litigation. So there were some practical

difficulties in getting it in place, but once it has been in place, again, I'm not sure -- have not been made aware of any issues, either school-based -- school-discipline based or the four areas that are carved out in the consent decree, where there have been any issues raised at all that anything improper has taken place by the City of Meridian Police Department.

THE COURT: Thank you for that overview.

Back when this Court first started addressing these particular issues, I raised the question then, as I am raising now, is whether any of the suggested approaches that the police department should take in visiting the schools on occasion, even after being summoned to the schools on some occasion, would have the unfortunate byproduct of causing the police to hesitate to enter the schools when they should, or would frustrate the police in taking some action that could escalate into something deadly and lethal.

We've had a number of instances of school violence in the recent years. And if the police had known that perpetrators had weapons on campus, then the police might have prevented many of those unfortunate developments.

So my question, then, is whether there is anything in the settlement's approaches that would have the unfortunate side effect of causing the police to maintain their distance when they should manufacture involvement, to cause the police

to forbear when they should be active, cause them to delay arresting when they should quickly get to the epicenter of some type of violence that's threatening.

And so that's my question is: What's the protocol if the police are alerted that someone might have firearms on campus or other deadly weapons, be they biological or chemical or anything else? What's the protocol under this approach for -- that the police have to follow before they can actually go on the campus quickly to redress that matter? Could I have someone respond to that?

MS. PORTER: Sure, Your Honor. This is Nicole Porter, again, with the United States. The settlement agreement that we entered into with the City doesn't prohibit the police department from going onto the campus at all. It just really prohibits the police department from making these school-based arrests for what we considered to be disciplinary offenses and the like.

The police officers can conduct arrests if the person is engaged in criminal activity. So if they committed a felony, if they committed any other criminal offense that involved a harm to the teachers or to the students, they can conduct an arrest for a misdemeanor in the officer's presence. And they can also conduct an arrest if they have a warrant.

So they're able to conduct arrests if they need to, if there's criminal activity occurring or suspicion of criminal

activity occurring. They just can't conduct an arrest for these things that we call school-based arrests.

THE COURT: If a student challenges the teacher with curse words or with physical violence, where does that fall?

MS. PORTER: I think the physical violence would fall under criminal activity, like that could possibly be an assault. But the cursing, foul language, you know, talking back to the teacher, insubordination, those things wouldn't be grounds for the police officer conducting any sort of arrests, going up to the school and conducting an arrest.

THE COURT: When the police officer shows up over at the school, what is the usual protocol that the police officer should follow? I'd imagine the police officer should meet with the principal; correct?

MS. PORTER: Yes. Yes. I think that this is -- these are very great questions, Your Honor. I think that these are questions, though, that would probably be able to be answered with more specificity from either the school district police chief or the Meridian police chief. I just don't want to provide you with information that's not 100 percent accurate.

THE COURT: I can understand, but I don't want the police handcuffed, not knowing how far they should go, and then forbear when they should be active. I don't want some lives to suffer, because the police didn't know what to do or what protocol to follow.

Was any of this addressed during the training?

MS. PORTER: The training mostly pertained to juvenile and adolescent development and then also bias-free policing. There was also training on the policies that talked about school-based arrests. I'm not sure whether that particular training went very deep into the protocol. Because the policy itself, it talked about the general prohibitions, but it didn't really talk about the protocol. And so I think that that was probably a conversation that the police chief would have with its officers separate from any sort of training.

THE COURT: Is the attorney for the police department on the line?

MR. WALTON: Your Honor, again, this is Ronnie Walton. I'm -- there is not a separate attorney for the City of Meridian Police Department. I'm here wearing the hat of the attorney for the City now.

Kermit Kendrick is on the line as well, and he's been serving as the attorney for the City of Meridian for the last year. And Kermit and I have not engaged in discussions about this matter, and I don't know if Kermit is aware of any issues with the police department that would be germane to your question.

THE COURT: Are there any guidelines provided to the police department with regard to these type questions?

MR. WALTON: I apologize, Your Honor. You're

breaking --

THE COURT: Okay. Can you hear me?

MR. WALTON: I can now.

THE COURT: Okay. Are there any guidelines, behavioral guidelines, that are directed at policemen, so that they would know what the boundaries are in instances like this?

MR. WALTON: Other than, Your Honor, just making the general observation that it was my understanding that those sort of issues were covered in the training that the police officers received, I cannot answer your question with specificity.

THE COURT: Well, I understand the training received by the police officers was from the perspective of the students, of the young folks and how their reasoning powers may be immature and different, but I didn't hear anything that tells me what kind of training the police officers are getting in how to respond to matters that I just described.

MR. WALTON: Your Honor, I would say to you on behalf of the City that we would have to supplement your question -- the response to your question with information that I simply do not have available to me this afternoon.

THE COURT: Now -- but do you understand why I'm asking this question?

MR. WALTON: Yes, sir. And may I --

THE COURT: Go ahead.

MR. WALTON: -- may I make an anecdotal observation that I think that -- at least what I think you're leading to, might suggest in the way of a chilling effect that this is having on the ability of the police department, as well as the schools, to make sure that we are having a school that is -- that has the appropriate level of discipline.

And in this context, at the last community input meeting that we had -- that's been, I think, well over a year ago now -- there were representatives of the Meridian Public School District school board there, in particular, the superintendent, the president of the school board.

And in the course of the discussion and feedback that we received from the community that night, the president of the school board said that the issues related to school discipline were creating very practical problems for the school to retain teachers because they were frustrated that they were not -- because of the constraints that they were under with the memorandums of understanding in this consent decree, they were not able to handle classroom discipline in such a way that they felt like they were getting appropriate backup. And because of that, the school district was experiencing an inordinate rate of teachers leaving the school system, and the ability to retain teachers was being hampered.

And that may not at all be germane to what the Court's inquiry is, but I couldn't help but remember that feedback

that we got during the course of our last community input meeting.

THE COURT: Well, that first part that you mentioned is exactly what's prompting my question, and that is, is whether there are sectors of the enforcement community that might get the impression that, based on this agreement, that the approach should be just to leave alone, step aside from any school issues, no matter what. And, therefore, if there is some call about some crisis at the school, just simply don't go, for fear of being in violation of this agreement here in some respect.

And I just wanted to know, has that been approached with the police department, so they at least would have some idea of what they can, can't do, and what the protocol should be when they do something. That's when I mean.

MR. WALTON: Well, again, Your Honor, the -- I'm not able to answer that question with specificity because I have not received any reports, any input, any issues that have been raised to the City attorney about any concerns that they have with whether or not the -- the fact that this consent decree is still in place operates as a chilling effect on the City's willingness to respond to situations where they perhaps should be responding and are hesitating to do so. But at the same time, I have every reason to believe, based on no news is good news, that the internal police department within the Meridian

Separate School District has a good relationship with the City of Meridian Police Department, and that there are not any issues that have been serious enough that the City Attorney's Office has been asked what to do in this situation.

THE COURT: Well, I would rather approach these matters with some mandate for a clear understanding of what the protocols are expected for the police department relative to their policing of the schools, as opposed to having to do an anatomy of this whole matter later after we've had some tragedy, and then we hear that the police who were close to the scene didn't think that they had the authority to go onto the campus.

MR. WALTON: Well, Your Honor, the City of Meridian Police Department today is still under this consent decree. And I think that it would -- it would be reasonable to assume that as long as the City has over -- hanging over its head the knowledge that its under this consent decree, that it has, as a practical matter, some chilling effect on the City's feeling like that it has the freedom without the concern of violating the consent decree coming into play.

THE COURT: Now, these documents were submitted to the Court some time ago, and at the time that I received them, I determined that I wanted to wait to see what was transpiring later.

I recognize under the terms of the agreement that

Meridian was supposed to stay in compliance for a year, and if so, then the other entities -- the oversight entities would then move to whole, full compliance, and ask that this document that we're now considering be entered terminating the oversight on this matter.

But I was concerned that a year might not have been long enough. And so, therefore, I just thought that it would be better if I just waited a while and see then what transpired. And that's why I started off this conversation with whether there had been arrests or whether there had been any tensions at this juncture, because I'm not -- I'm not totally familiar with the mindset of the community on this matter and whether they understood that as long as everything was quiet for a year, that these documents would be submitted to the Court terminating this matter.

And I didn't want just to automatically terminate it just because the year's gone by. I wanted to see if there was going to be something else that was coming up, and what I'm hearing is, is that nothing else has come of it. But nevertheless, I still have these same questions I had, I believe, back when this litigation first hit my Court, and this matter of entering into some forbearance on the part of the police, et cetera, being a central part of the concern here. And my question was whether it would have just what you asked, a chilling effect without some clear pronouncement as

to what the police should be able to do with regard to the schools.

So when I heard the term "training," I wondered then whether that had crossed that line and also dealt with the police. But, apparently, that training only deals with the mindset of youngsters and how police should understand better the functioning of young minds. But it didn't really address -- that training approach doesn't really address my concerns because I want to know what boundaries imprison the police in their actions and their response to the schools in times of crises.

Now, I also have on the phone, I believe, the County Attorney?

MR. THAGGARD: Yes, Your Honor. Lee Thaggard.

THE COURT: All right. And how are you getting along?

MR. THAGGARD: I'm doing well, Your Honor. How about you?

THE COURT: Okay. You going to go ahead and solve this matter for us?

MR. THAGGARD: We can try, to the extent the County can. I'm not sure to what extent we can.

THE COURT: Well, you've been listening to all this stuff, right?

MR. THAGGARD: Absolutely.

THE COURT: Okay, then. Well, then, what should be the

answer here as --

MR. THAGGARD: The answer --

THE COURT: -- to this boundary line to educate the police as to what they can and can't do?

MR. THAGGARD: Oh, Lord.

THE COURT: I felt your brain waves, you know, a little bit earlier emanating through the telephone here, and I said, Mr. Thaggard is just waiting to jump in on this thing.

So what about it? Do you think that there could be a chilling effect?

MR. THAGGARD: Well, certainly, certainly. And it's -- I can just say -- would be to echo what Mr. Walton has said about concerns about the effectiveness of discipline, given the parameters that the teachers have to operate under in the schools. And that's just -- I'd say that's probably just common conversation in the City of Meridian. It's not something that -- professionally, that I hear or -- and certainly not in the capacity of working on this lawsuit, which really has not involved anything since the County and the judges were dismissed in 2019. But I think certainly that, yes, there would be a chilling effect.

THE COURT: Well, you know, that same type of question was raised in my order dismissing them from the lawsuit, you know, the judges, et cetera. And the same kind of matter, the same kind of concerns as to whether it would have an

unwarranted and unwanted side effect of restraining the administration of justice in any respect.

Well, similarly, I'm concerned about any side effect on restraining the administration of police -- of policing, and so that's why I'm asking the questions. And so, apparently, you think there might be some chilling effect?

MR. THAGGARD: Well, not any more so than what you heard from Mr. Walton a moment ago. And that's -- I think what he was saying is that's consistent with what I'm hearing out in the community.

I cannot, on this call today, certainly state the position of either one of the judges on that issue. That is something I would have to confer with them on.

And from a law enforcement perspective, the Lauderdale County Sheriff's Department really has not been involved in this, so I can't speak from that perspective either. I'm not sure how much that helps.

THE COURT: It helps. I mean, it lets me know that you have a similar concern.

At one point -- at one point -- I believe, at the point when you-all initially submitted these papers, I started drafting something that I didn't finish, because at the time, I was involved in some other litigation. And I had said as soon as I finish this, let me see if I can finish it.

But I started playing with a draft of delineation, that

is, a draft that would be important to law enforcement setting out the boundary lines here; that is, what is forbidden, what is allowed, what is in the gray area, those kinds of things, so that the police, in their training, will consider that.

And then the police would have some idea as to what they could and couldn't do, as opposed to some serious uncertainty that would only be addressed after the unfortunate event has occurred that falls between the cracks, and we've lost the lives of some students and teachers and administrators, perhaps from some maniacal assault on the school by a student. And the police saying, we didn't know that we could do this, or we didn't know that we could do that; that was not clear to us.

And I had thought at that time that maybe what would be good is to have police training on what they can do, as opposed -- as opposed to this approach that I've heard so far, which is said to tell them what they can't do. That's where I am.

MR. THAGGARD: Your Honor, Lee Thaggard again. That certainly makes sense. Sort of from the County's perspective -- and that was my role when the lawsuit was pending as to the County, the judges had separate counsel, so I'm just listening in for them today -- but that certainly makes sense in terms of training. But it also would be beyond what my role has been in the case or what I could speak to.

THE COURT: Okay. Thank you, Mr. Thaggard.

MR. WALTON: Your Honor, this is Ronnie Walton again. Could I make a comment?

THE COURT: Go right ahead.

MR. WALTON: There are four specific exceptions that are carved out in the consent decree that speak to the reasons that the police -- Meridian Police Department can go on campuses to respond to calls or to make arrests, and anything related to weapons is one of those specific carve-outs.

So -- and I know that the police officers, in their training, have had these four issues, these four specific carve-outs, brought to their attention. I think they've all signed documents, acknowledge that they understand what those four things are. And, again, weapons is the one that would be the easiest for -- for there not to be any misunderstanding whatsoever.

So to address your worst case scenarios of some issue with a weapon being out there, I don't think there's any doubt in the minds of the City of Meridian Police Department that they are unencumbered in any way by this consent decree to respond to those issues.

THE COURT: Okay. Well, I might go back to what I originally thought when I received these papers, is there should be some explanation as to what this consent agreement does and what it doesn't do. And so I'm going to look at that

and see, then, how I think it's best for me to approach that, because I don't want any confusion among the students either, in some attitude of being untouchables, that they get to the school and, therefore, nothing can happen to them whatsoever, period.

And so I just want there to be some understanding of the thrust of this matter and what's here being considered, so I'm going to look at it. And in the next two weeks, I am going to send something to the parties on this particular matter.

In the meantime, let me turn to all of you and ask, is there any time-sensitive factor with regard to signing these papers?

I'm waiting. Anybody? Is there any time-sensitive factor?

Because I think I want to try my hand at writing out something concerning what can be done under the consent and what cannot be done. And if you-all have some considerations on those points, I want you to send them to me. And the faster I get a response from everybody, and the faster I correlate all of this, the faster I get it back to you. Because I do have some ideas as to what I should say in any such document.

Now, again, is there something time sensitive about this matter and my signature on these documents?

MR. WALTON: Your Honor, this is Ronnie Walton on behalf

of the City. I'm not aware of any time-sensitive issues at all.

THE COURT: I wasn't aware of any when I decided to wait and see if anything was going to transpire. Because at the time when I first got these documents, my thought was I want to see what's going to happen now, whether I'm going to have some demonstrations from elements of the community that are just waiting for me to sign off on it, or whether I'm going to have some suggestions from the police department or confusion or whatever. And so I just wanted to see whether there was going to be anything.

But does anyone have any notion about a time sensitivity?

MS. PORTER: No, Your Honor. This is Nicole Porter from the United States. No, the consent decree contemplates that the agreement will terminate once the City has reached substantial compliance and maintained that compliance for a year. But other than that, we don't have any sort of time constraints on you signing the proposed order.

THE COURT: And I don't hear anyone raise any objections. So then I will try to add the -- or the order that I just mentioned.

Now, I would like to hear if anyone has a notion about carving out an explanation for this agreement and what it does and doesn't do. If you have something that you feel that any

such -- information the order should include, then let me know because I would hope that the press would pick up on this order, so that folk in the community and the school community and elsewhere would understand what this order proposes to do and what this order does not propose to do.

So if any of you have any thoughts along those lines, then I'll give you one week to get me your response. So today is Tuesday. I'll give you until next Tuesday. It can be informal. You don't have to make it some kind of edict. Just go ahead and stroke out what factors you think should be in such an order, what explanations should be in there, and send me what you have.

In the meantime, I'll be trying to put together something. And if I do get it all put together, like I said, I'm going to send it to you for your approval or disapproval.

MS. PORTER: Your Honor, this is Nicole Porter from the United States. I was wondering if we could have more time. I would like to have a copy of the court transcript in case there are additional questions that we can provide answers to in our response.

I know that you asked a lot of important questions during (AUDIO GAP) that I wasn't given -- I didn't have an opportunity to respond to. And I'm actually going to be out on leave, too, for the next couple of days, and so that's another reason why the United States would like a little bit

more time.

THE COURT: Now, wait a minute. You're going out on leave during these troubled times.

MS. PORTER: I'm sorry, Your Honor, yes, but I have to provide a measure of stability and sanity to my little ones here at home. So we're planning on trying to do a socially distanced and appropriate getaway.

THE COURT: Where are y'all going?

MS. PORTER: We're staying local. We're going to go to a national park in Virginia, so we're staying local.

THE COURT: Okay. Boy, that sounds great. Look, I'm going to get a report from you after this is over, so I want to know about that national park. You know, I spent some time in Virginia when I was in the military, so I had contemplated a trip before this whole thing happened. And some of my friends were waiting on me to come, but the virus had a different idea. And not to mention that 10-week trial I had to endure down on the Coast. So then came right back and started another trial, so -- and then, before I went, had a trial.

So, anyway, all those things interrupted my plans. And so you're telling me that nothing's interrupting your plans?

MS. PORTER: Well, we actually had a larger vacation planned before all of this hit, and so we had to cancel that vacation. And this is just the one last hurrah for the

children before they go off to school -- not necessarily go off to school, but before they start school next week, so...

THE COURT: Okay, then. Well, I know what that means, them going off to school. Bittersweet moment, right?

MS. PORTER: Right. Right.

THE COURT: You know, hate to say goodbye to them, but on the other hand, glad to say goodbye to them and let them go ahead and get started.

MS. PORTER: That's true, Your Honor.

THE COURT: So then when you said some extra time then, what are you asking for?

MS. PORTER: I don't know. Maybe the court reporter can let us know how long it will take for us to get the transcript. I want to make sure that our response is responsive to any questions that you raised today. So maybe a week after we get the transcript, we can have our comments in to you.

THE COURT: Candice --

THE COURT REPORTER: Yes, sir.

THE COURT: -- how long will it take you to prepare a transcript?

THE COURT REPORTER: Well, Judge, they have a three-day turnaround option, a seven-day turnaround option, a 14-day option, and a 30-day option. So they need to tell me which option they want to order.

THE COURT: Okay.

MS. PORTER: I think we can do three-day option. I don't know if there's any, you know, prohibition from our department in terms of costs and everything. I don't know.

I'll ask my colleague from DOJ, Rich Goemann, if he knows anything about any sort of prohibition about asking for a rush copy of a transcript. But if there's not, then I'm fine with the three-day turnaround.

MR. GOEMANN: I don't know of any prohibition.

THE COURT: Okay. Well, just in case there is and you have to rely upon, let's say, a seven-day, then let's not do the two weeks. Let's make it four weeks. Okay?

MS. PORTER: Okay.

THE COURT: Everyone says there's nothing time sensitive, but it's important to make sure the community is educated as to this whole development here, what it means, what it doesn't mean. So let's just make it a month. All right?

MS. PORTER: All right. Thank you, Your Honor.

THE COURT: All right, then. And so you-all would send me whatever suggestions you want included within this order in the next four weeks. By that time, I should have a rough of what I think should be in there. And then I'll get back in contact with you-all by way of another telephone call, and at that time I'll tell you about my attempts to merge anything I

receive with what I already have put together. Okay?

MS. PORTER: Thank you, Your Honor. That sounds good.

THE COURT: All right. Anything from anybody else?

All right. Hearing nothing else, I want to thank you-all for this conference call. It's been on my mind for a while, and I hope that we can move forward.

Thank you so much. I'm ending the call.

***************************************************************

**COURT REPORTER'S CERTIFICATE**

I, Candice S. Crane, Registered Professional Reporter, Certified Court Reporter, in and for the State of Mississippi, Official Court Reporter for the United States District Court, Southern District of Mississippi, do hereby certify that the above and foregoing pages contain a full, true, and correct transcript of the proceedings had in the forenamed case at the time and place indicated, which proceedings were stenographically recorded by me to the best of my skill and ability.

I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

THIS the 4th day of September, 2020.

/s/ Candice S. Crane, CCR

Candice S. Crane, RPR, CCR #1781
Official Court Reporter
United States District Court
Candice_Crane@mssd.uscourts.gov