IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA                                                              PLAINTIFF

vs.                                                                        Civil Act. No. 3:13-cv-978 HTW-LGI

CITY OF MERIDIAN;
STATE OF MISSISSIPPI; MISSISSIPPI
DEPARTMENT OF HUMAN SERVICES; and
MISSISSIPPI DIVISION OF YOUTH SERVICES                                        DEFENDANTS

**ORDER TERMINATING SETTLEMENT AGREEMENT BETWEEN THE UNITED STATES AND THE CITY OF MERIDIAN, MISSISSIPPI**

Before this court is the Joint Motion [doc. no. 131] of the parties, the Plaintiff United States of America and Defendant City of Meridian, Mississippi (collectively, "the Parties"), for an order terminating the Settlement Agreement [doc. no. 83] entered in this case.

The Parties are in agreement that City of Meridian is in "substantial compliance" with all provisions of the Settlement Agreement, and that the City has maintained substantial compliance with the provisions of the Agreement for well over one year.  The terms of the Agreement provide at Section VII.B. that the Agreement may be terminated "when the City has achieved substantial compliance with all substantive provisions of this Agreement and has maintained that substantial compliance for 12 twelve consecutive months." *Order of Entry of Settlement Agreement*.  [doc. no. 83 p.13].

1

In December of 2011, the United States notified the City of Meridian, Mississippi, and Lauderdale County, Mississippi, that it was investigating their administration of juvenile justice pursuant to the Violent Crime and Law Enforcement Act of 1994. Title 34 U.S.C. § 12601[1] (formerly cited as 42 U.S.C. § 14141). On June 29, 2012, the United States notified the State of Mississippi that it had expanded its investigation to include the Mississippi Division of Youth Services, a division of the Mississippi Department of Human Services.

On August 10, 2012, the United States issued a letter informing these Defendants[2] it had determined they were violating the rights of children in Meridian, located in Lauderdale County, Mississippi. The letter advised, among other things, that there was reasonable cause to believe the City of Meridian, Mississippi, Police Department had a pattern or practice of arresting public school students without probable cause to believe that an illegal offense had been committed, thereby engaging in unconstitutional conduct. As a consequence, although denying the allegations, the City of Meridian revised its policy limiting the circumstances under which police officers could arrest youths on school grounds.

---

[1] § 12601. Cause of action
(a) Unlawful conduct
It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.
(b) Civil action by Attorney General
Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)1 has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.
Title 34 U.S.C. § 12601

[2] The United States issued the letter to the City of Meridian, Lauderdale County, and the State of Mississippi. When the Untied States filed its lawsuit in this court, Judge Frank Coleman and Judge Veldore Young, Lauderdale County Youth Court Judges, were also named as defendants, as well as the Mississippi Department of Human Services and the Mississippi Division of Youth Services. The Youth Court Judges were later dismissed from the litigation by this court.

The United States, not agreeing that the problem had been fully remedied, filed the instant lawsuit on October 24, 2012, against the City of Meridian; the Lauderdale County Youth Court Judges; Lauderdale County; the State of Mississippi; the Mississippi Department of Human Services; and the Mississippi Division of Youth Services [doc. no. 1].

For subject matter jurisdiction, this court relied upon 28 U.S.C. § 1331[3] which grants to federal district courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. Federal question subject matter jurisdiction was present, since this lawsuit arose under the Violent Crime and Law Enforcement Act, a federal enactment. See 34 U.S.C. § 12601.

Title 34 U.S.C. §12601(b) allows the United States Attorney General to bring a civil action, for or in the name of the United States, if the Attorney General can show there is a "pattern or practice of conduct" by a governmental authority responsible for juvenile justice that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. 34 U.S.C. §12601.

Jurisdiction was also granted to this court under 28 U.S.C. § 1345[4] which grants to the federal district courts original jurisdiction of suits brought by the United States or an agency or officer of the United States.

The United States asserted that the Defendants, including the City of Meridian, helped to operate a "school-to-prison pipeline" by arresting, adjudicating, and incarcerating children for

---

[3] Federal Question
The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.  Title 28 U.S.C. § 1331

[4] United States as plaintiff
   Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced y the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress. Title 28 U.S.C. § 1345

3

school infractions without exercising appropriate discretion and without regard for the Defendants' obligations under the United States Constitution. *Complaint* [doc. no. 1 at 9].

The "school to prison pipeline" term was coined on the notion that these practices tended to push students <u>out</u> of the classroom and <u>into</u> the juvenile justice system, the streets, and eventually into the adult criminal justice system. Deborah N. Archer, *Introduction: Challenging the School-to-Prison Pipeline*, 54 N.Y. L. SCH. L. REV. 867, 868 (2009). Challengers to this development contend that these practices are part of a nation-wide trend toward law enforcement punishing behavior that was once disciplined within the school – conduct which is much more likely to result in a child having a criminal record than a high school diploma. See Jennifer M. Grieco, *Pipelines and Their Diverging Paths to the Justice System,* 98 Mich. B.J. 12 (January, 2019).

The school to prison pipeline is referred to by one writer as a "controversial concept and a disappointing reality." Areto A. Imoukhuede, *The Right to Public Education and the School to Prison Pipeline*, 12 Alb. Gov't L. Rev. 52, 52–53 (2019)

Studies have shown that some groups of students are disproportionately impacted by this trend. Students of color and students with disabilities tend to be disciplined more harshly and are more frequently referred to law enforcement for minimal misbehavior. Saady*, Throwing Children Away: The School-to-Prison Pipeline, The American Conservative* (August 13, 2018) < https://www.theamericanconservative.com/articles/throwing-children-away-the-school-to-prison-pipeline/>. Eventually these students drop out of school or are pushed out of school.

The United States accuses the City of Meridian of nefarious policies and practices which have contributed to maintaining this pipeline. [5] According to the United States, the rate of expulsions and out-of-school suspensions by the Meridian School District for longer than ten days was almost seven times the rate for Mississippi schools, generally. During the 2006-2007, 2007-2008, 2008-2009 school years and the first semester of the 2009-2010 school year, the United States said, all of the students referred to law enforcement by the Meridian School District were black, all of the students expelled were black, and 96 percent of the students suspended were black. [6] *Complaint* [doc. no. 1 pp. 8-9]. At the time, the population of the City of Meridian was approximately 62% black, 36% white, 2% Hispanic, and 1% Asian. The Meridian Public School District had a student enrollment that was approximately 86% black, 12% white, 1% Hispanic, and 1% Asian. *Complaint* [doc. no.1 pp. 8-9].

The United States provided the following unsettling statements:

> MPD [Meridian Police Department] automatically arrests all students referred to MPD by the [school] District, [which] employs a system of severe and arbitrary discipline that disproportionately impacts black children and children with disabilities . . . the children arrested by MPD are then sent to the County juvenile justice system, where existing due process protections are illusory and inadequate . . . The Youth Court places children on probation, and the terms of the probation set by the Youth Court and DYS [Department of Youth Services] require children once on probation to serve any suspensions from school incarcerated in the juvenile detention center. Once Defendants -- collectively the administrators of the juvenile

---

[5] As part of this lawsuit, the United States also accused the State of Mississippi of violating children's rights through the Department of Human Services and its sub-agency, the Division of Youth Services. The United States has entered into a Separate Agreement with these Defendants. See [doc. no. 84].

[6]  Although included in the initial allegations of the Complaint in this case, improper suspensions and expulsions were not the focus of the investigation and litigation against the City of Meridian in the case *sub judice*. At the heart of this lawsuit and the Settlement Agreement reached with the City of Meridian in this case were school-based arrests by the Meridian Police Department.

Another lawsuit against the City of Meridian still pending before this court, *Barnhardt v. City of Meridian*, Civil Action No. 4:65-cv-1300-HTW-LRA (S.D. Miss.) includes matters surrounding the issue of appropriate student "discipline" as one of the issues to be resolved in that case. The *Barnhardt* case is between private plaintiffs, the United States (Plaintiff-Intervenor) and the Meridian School District (Defendants).

> justice system -- place a child from the District in this cycle, he or she is repeatedly subjected to unconstitutional government action and potential incarceration without procedural safeguards.

*Id.* at pp. 9-10.

The United States' Complaint alleged that these entities were violating the substantive and procedural due process rights of the students subject to jurisdiction of the Lauderdale County Youth Court, including the systematic arrest and incarceration of students for minor, technical violations which should be handled by the schools as matters for school discipline or suspensions.  *Complaint* [doc. no.1 p.1]

The Meridian Police Department ("MPD"), according to the United States' Complaint, automatically arrested all of the children referred to it. *Complaint* [doc. no.1 p.9].  Between 2006 and the first semester of 2009, says the United States, all the children referred to law enforcement by the Meridian School District were black.  Arrest of a student involved handcuffing the child regardless of age and transporting the child to either MPD headquarters or, if the child was on probation, directly to the Juvenile Center. The infractions that resulted in these arrests ranged from conduct generally considered criminal, such as possession of drugs or weapons, to conduct that would be considered only a school disciplinary infraction, such as being disrespectful, refusal to follow directions of a teacher or using profanity.  *Complaint* [doc. no.1 p.1]

According to the United States, the school district's system of punishment was so severe and arbitrary as to "shock the conscience." *Complaint* [doc. no.1 p.2].  The Complaint continued: "Children are regularly and repeatedly handcuffed and arrested in schools and incarcerated for

days at a time without a probable cause hearing, regardless of the severity – or lack thereof - of the alleged offense or probation violation.[7] *Complaint* [doc. no.1 p.2].

In March of 2012, the Meridian School district established an internal police department, the Meridian Public School District Police Department.  It initially consisted of four "school resource officers" including a chief.  The School District Police Department did not effectuate arrests, so the School District continued to rely on the MPD for the arrest of students referred to law enforcement.

The United States, adding a constitutional face to these allegations, contends that the Defendants, collectively, have consistently violated the rights of these children under the Fourth[8], Fifth[9] and Fourteenth[10] Amendments to the Constitution.  Although well-known to lovers of the United States Constitution, these sacred provisions of our Constitution provide and protect certain of our freedoms, as follows:

---

[7] The United States contends that once referred to the youth court system, violations of the students' constitutional rights continued.  Also named as defendants in this case are the State of Mississippi, the Mississippi Department of Human Services, and the Mississippi Division of Youth Services.  These entities have entered into a separate Settlement Agreement with the United States addressing these concerns.  See [doc. no. 84].

[8] The Fourth Amendment to the United States Constitution guarantees: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const., Amend. IV.

[9] The Fifth Amendment to the United States Constitution guarantees: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const., Amend. V.

[10] The Fourteenth Amendment to the United States Constitution guarantees: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the

An arrest made without probable cause constitutes an unreasonable seizure and is a violation of the Fourth Amendment. *See Keim v. City of El Paso,* 162 F.3d 1159, 1998 WL 792699, at *4 n. 4 (5th Cir. Nov. 2, 1998) (citing *Graham v. Connor,* 490 U.S. 386, 395 (1989); *Duckett v. City of Cedar Park*, 950 F.2d 272, 278–79 (5th Cir.1992)).

The constraints of the Fifth Amendment, inter alia, provide that in a criminal case, no one shall be forced to be a witness against himself.  As interpreted by the landmark United States Supreme Court case, *Miranda v. Arizona,*  this requires that a person in custody must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. *Miranda*, 384 U.S. 436, 444 (1966). Failure to prove that these measures have been taken denotes a violation of the person's Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *JDB v. North Carolina*, 564 U.S. 261, 269 (2011; see also *Florida v. Powell,* 559 U.S. 50, 50-51 (2010).

Proof of a Fourteenth Amendment violation requires a showing that a person has been deprived of life, liberty, or property without due process of law. *Goss v. Lopez,* 419 U.S. 565, 579 (1975) (at minimum, for students facing suspension due process requires "some kind of notice and … some kind of hearing"); *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' ... or interferes with rights 'implicit in the concept of ordered liberty' ") (citations omitted).

---

privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV.

This lawsuit is not alone in addressing the "school-to-prison pipeline" in the courts of this country. From 2003 to 2008 in Luzerne County, Pennsylvania, the juvenile courts were a major component of a school-to-prison pipeline. Almost all of the juvenile offenders appearing in the courts were adjudicated as "delinquent" and approximately half were unrepresented by counsel. The juvenile courts then imposed unduly harsh sentences for even minor infractions, including matters that were more properly the subject of school discipline.[11]

The Pennsylvania Supreme Court appointed a Special Master to review all Luzerne County juvenile court adjudications and dispositions that had been affected and to make recommendations to the Court concerning appropriate remedial actions to rectify the situation. See *In re Bruno,* 101 A.3d 635, 671 (Pa. 2014) (citing *In re J.V.R. Order* (docketed at 81 MM 2008), 2/11/2009 (per curiam)). As a result, the Pennsylvania Supreme Court ordered, *inter alia,* thousands of delinquency adjudications vacated and expunged. See *Bruno* at 672-73.

In 2008, the American Civil Liberties Union ("ACLU") and parents of Atlanta school children filed a class action suit against the Atlanta Independent School System ("AISS") and a private contractor, Community Education Partners ("CEP"), for, *inter alia,* the treatment of students at an Atlanta alternative school for at-risk children. *M.H. v. Atlanta Independent School System,* No. 1:08-cv-01435-BBM (N. D. Ga.). In that case the school's search and discipline policies were found to be unconstitutional. The children were routinely suspended from school for minor incidents and were not always granted hearings prior to being suspended. Students were also disproportionately referred to juvenile courts. *Id.* The lawsuit resulted in a settlement in which the Atlanta School Board agreed to make significant changes, including terminating its

---

[11] A scheme was later uncovered in which some juvenile court judges in Pennsylvania were part of a "kids-for-cash" scheme whereby they had been accepting kickbacks from for-profit juvenile detention facilities in exchange for sending juvenile defendants to those facilities. See *In re Bruno*, 101 A.3d 635, 671 (Pa. 2014) (citing *In re J.V.R.* Order (docketed at 81 MM 2008), 2/11/2009 (per curiam)).

9

contract with CEP, the company contracted to assist with running the alternative school. *Id*.; See Judith A. M. Scully, Examining and Dismantling the School-to- Prison Pipeline: Strategies for a Better Future, 68 Ark. L. Rev. 959, 982-83 (2016).

Many other lawsuits have been filed by individual parents on behalf of their children against local governments and school districts for violations of their children's constitutional rights with mixed results.  Even where the plaintiffs did not prevail, however, judges often recognized that exposing children to the criminal justice system very negatively impacts their lives  See e.g., *Hawker v. Sandy City Corporation*, 774 F.3d 1243, 1244 (10th Cir. 2014) (Lucero, J. concurring) (nine-year-old who admittedly stole an ipad was slammed against a wall and handcuffed, prompting Judge Lucero to comment on the potentially devastating future consequences to the child and to ask "why are we arresting nine-year-old school children?"); see *Hinds County School District Board of Trustees v. R.B. ex rel. D.C.B.,* 10 So.3d 387, 411-412 (Miss. 2008) (Justice Graves, dissenting) (discussing the school-to-prison pipeline phenomenon and its effect on children).

Eventually, in the instant lawsuit, pursuant to settlement negotiations approved and sometimes facilitated by this court, most of the parties reached a compromise and settled their differences with solutions to be monitored by this court.

The United States, on September 18, 2015, entered into a settlement agreement with the following Defendants:  The State of Mississippi; the Mississippi Department of Human Services; and the Mississippi Division of Youth Services.  See *Settlement Agreement* [doc. no.  84].

The United States' allegations against the Lauderdale County Youth Court Judges and Lauderdale County after a contested court hearing were dismissed by this Court on September 30, 2017, [doc. no. 116].  Those dismissals were affirmed by the United States Court of Appeals

for the Fifth Circuit on February 1, 2019. *United States v. Lauderdale County,* 913 F.3d 960 (5th Cir. 2019). [doc. no. 129].

The Agreement between the United States and the City of Meridian [doc. no. 83] was filed with this court on September 18, 2015. That Agreement, which is at issue here, primarily does the following: 1) prohibits the Meridian Police Department ("MPD") from arresting children for misbehavior that appropriately should be addressed as a school discipline issue; 2) requires the MPD to create policies and provide training detailing the specific and limited circumstances under which school-based arrests[12] may be conducted and provide due process protections to those youths who are arrested; 3) requires the City of Meridian to seek a Memorandum of Understanding between the MPD and the Meridian Public School District Police Department that delineates authority and specifies procedures for effecting school-based arrests; 4) requires officers to receive training regarding interactions with juveniles while on school grounds (including training in bias-free policing and training regarding youth and adolescent behavior and development), and for the Department to track and thoroughly investigate complaints about school-based arrests and MPD conduct in schools; and 5) requires the City to collect and make public data on school-based arrests and hold community input meetings every six months to inform the community of the City's progress in implementing the Agreement.

---

[12] The Settlement Agreement defines "school-based arrest" as follows:
"School-based arrest" means an arrest of a student on property controlled by the Meridian Public School District while the student is attending school. This definition includes the arrest of students at school programs or events and the arrest of juveniles being transported to and from school on buses controlled by the Meridian Public School District. This definition does not include the arrest of juveniles at events that are advertised to the general public or involve students from other school districts.
*Settlement Agreement* II. N. [doc. no. 83 p. 3].

The Settlement Agreement required the selection of a Police Independent Auditor to assess the City's compliance with the substantive provisions of the Agreement. *Settlement Agreement* [doc. no. 83 p.9] Paragraph V.D.1.  The Police Independent Auditor's duties also included making recommendations and providing technical assistance regarding how the City of Meridian could achieve compliance.  *Settlement Agreement* [doc. no. 83 p.6] Paragraph IV.A.

Pursuant to the terms of the Agreement, the United States and the City of Meridian were expected to agree upon the naming of the Police Independent Auditor within sixty (60) days of the effective date of the Settlement Agreement.  If unable to reach agreement within the allotted time, the parties were to submit to the court, the names, and curricula vitae of up to two individuals as candidates for the position. In that event, the Court would select the Independent Auditor from among those nominated by the parties. *Settlement Agreement* [doc. no. 83] paragraph V.D.1. The parties did, in fact, reach a somewhat foreseeable impasse, and thus, submitted their respective nominations to the court.

The United States nominated the Police Foundation, with (retired) Police Chief Rodney Monroe serving as the lead subject matter expert. The City of Meridian initially championed another candidate.  This court devised the following procedure for selecting the Independent Auditor:  The parties were directed to file papers and exhibits championing their respective candidates.  The court reviewed the curricula vitae of the candidates and later conducted a proceeding to hear the presentations of the parties and candidates.  This court personally questioned the candidates.

 After the court proceeding began, and after some discussion, however, the parties agreed to nominate the Police Foundation for the Independent Auditor position.  This court again questioned Chief Rodney Monroe and the Police Foundation's Director of Programs regarding

12

their relevant experience and qualifications. Satisfied with their presentations, this court in April of 2016, appointed the Police Foundation as the Independent Police Auditor ("Auditor") to monitor the City's compliance with the Agreement.

After that appointment, the City of Meridian began implementation measures. The City created new policy and trained the Meridian Police Department officers on that policy. It entered into a joint Memorandum of Understanding with the school district police department. The City revised its policy regarding the processing of complaints about MPD arrests and police conduct in the schools to ensure that those complaints would be appropriately handled, and that officers would be held accountable. As outlined in the Agreement, the City of Meridian conducted training for its police officers that included instruction pertaining to the mental processes and behavior of children and adolescents versus adults, and training on bias-free policing. The City regularly held community input meetings and posted any significant actions taken on its website.

After issuing several reports on the City's compliance efforts, the Auditor determined that the City of Meridian was in substantial compliance with all provisions of the Agreement. The Independent Auditor ceased monitoring the City in January of 2018, in accordance with Subsection F of Section V. of the Agreement, titled "Implementation and Monitoring."[13] [doc. no. 83 p. 12]. The Auditor, the Police Foundation, filed its third and Final Compliance Report on

---

[13] This section provides as follows:
V. Implementation and Monitoring
   . . .
       F. Annual Meeting Regarding the Continued Need for External Monitoring.
   . . .
   5. Monitoring by either the Independent Auditor or the United States shall terminate when the City has achieved substantial compliance with all provisions in the Settlement Agreement and maintained substantial compliance with all provisions for a period of one year. *Settlement Agreement* [doc. no. 83 pp.11-12].

January 16, 2018 [doc. no. 123].  Monitoring was then transferred from external monitoring to monitoring by the United States.

The United States now has concluded, based on its monitoring of the Agreement, that the City is in substantial compliance with all of the required provisions and has been in substantial compliance for well beyond the twelve-month period which represents the requisite period of compliance before the Agreement can be terminated.  There have been no school-based arrests, the MPD officers are following the Memorandum of Understanding with the school district police, and the MPD officers continue to receive training regarding interactions with juveniles. Additionally, the City has held several community input meetings, and has posted on its website the measures it has taken to come into compliance with the Agreement.

This court conducted a telephonic hearing on September 4, 2020, at which time this court asked various and probing questions regarding the specifics of the training offered to the Meridian Police Department.  This court was reminded that Dr. Lee Marlow had conducted training in July of 2017, regarding adolescent child development.  Other instructors also had conducted training on bias-free policing.  The instruction, according to the Government, was well received.  It was attended by all Meridian police officers and command staff, as well as members of the Department of Justice and an attorney for the City of Meridian.  During the conference, this court was also able to confirm that no school-based arrests had been made since the United States' last assessment of the City of Meridian's Compliance with the Settlement Agreement, which was submitted on September 12, 2018.

The terms of the Agreement provide at Section VII.B that the Agreement may be terminated "when the City has achieved substantial compliance with all substantive provisions of this Agreement and has maintained that substantial compliance for 12 twelve consecutive months."

*Order of Entry of Settlement Agreement.* [doc. no. 83 p.13]. The parties, in their Joint Motion to Terminate the Settlement Agreement, state that the City of Meridian has met those conditions.

Although the terms of the Agreement provide that it could be terminated after substantial compliance has been consistently maintained by the City of Meridian for twelve months, this court was of the opinion that an additional period of observation would be beneficial. The allegations against the City of Meridian of constitutional violations of its student's rights, if true, were very serious. Legal writers and the courts recognize that interactions with the criminal justice system have short-term and long-term consequences for a child's mental and physical health, and for that child's success in school and future employment prospects. See *Hedgepeth v. Wash. Metro Area Transit*, 284 F. Supp.2d 145, 160 (D.D.C. 2003) aff'd sub nom. *Hedgepeth ex rel. Hedgepeth v. Wash. Metro Area Transit Auth.* 386 F.3d 1148 (D.C.Cir. 2004); Judith A. M. Scully, 68 Ark. L. Rev. 959, 978-80. Arrest of a child merely for violation of school rules is especially traumatic, according to the United States .*Complaint* [doc. No.1].

As the United States Supreme Court said in the landmark case of *Goss v. Lopez,* "[E]ducation is perhaps the most important function of state and local governments," *Goss v. Lopez*, 419 U.S. 565, 576  (1975) (quoting *Brown v. Board of Education,* 347 U.S. 483, 493 (1954).

This court chose to exercise its discretion to keep the provisions of the Agreement in place to ensure ongoing and long-term compliance with the terms and objectives of the Settlement Agreement. This court wanted assurance that adherence to the Agreement was not a temporary notion, but a lasting and enduring effort to create viable ingrained policies, appropriate new procedures and automatic responses which would nullify any vestige or accusation that the City of Meridian manifested a "school-to-prison pipeline."

This court also recognizes local governments are required to perform a difficult balancing act. On the one hand, they are tasked with maintaining appropriate discipline and decorum in schools and providing a safe environment for its students and staff. On the other hand, they are required to protect the constitutional rights of students, even in the face of alleged misbehavior. Although concerned that the City was complying with the terms to which it had agreed, this court was, and is, concerned as well about the possible unintended consequences of this litigation – that there could be a chilling effect, such that the Meridian Police Department would be reluctant to respond to incidents at the schools that legitimately required their presence. Additionally, this court pondered whether knowledge of this litigation by students might have the additional consequence of empowering those students who might be inclined to misbehave.

While these matters of discipline in the schools are not directly at issue in this lawsuit, they were and are of concern to this court, as "unintended consequences." As mentioned earlier, this court has another Meridian case, *Barnhardt et al and United States of America, v. Meridian Municipal Separate School District et al*, Civil Action No. 4:65-cv-1300- HTW-LRA (S.D. Miss.) which may shed light on the above concerns.

Having maintained "substantial compliance" with the Agreement for over three years, the City of Meridian has satisfactorily met and sustained the conditions outlined in the Agreement.

Wherefore, for good cause shown, the Parties' Joint Motion [doc. no. 131] to Terminate the Settlement Agreement between the United States and the City of Meridian is hereby GRANTED.

SO ORDERED AND ADJUDGED, this 23rd day of February, 2022.

s/ HENRY T. WINGATE<br>
Honorable Henry T. Wingate<br>
United States District Court Judge